UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHRISTINE MARIE SCARPINO,

                        Plaintiff,

       v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
_____

<u>DECISION & ORDER</u>

15-CV-6231P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Christine Marie Scarpino ("Scarpino") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Income Benefits ("DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 12).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 9, 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Scarpino's motion for judgment on the pleadings is denied.

## BACKGROUND

### I.      Procedural Background

Scarpino protectively filed for DIB on August 4, 2011, alleging disability beginning on February 10, 2011, as a result of vision problems in both eyes.  (Tr. 118, 122).[1]  On November 22, 2011, the Social Security Administration denied Scarpino's claim for benefits, finding that she was not disabled.  (Tr. 66).  Scarpino requested and was granted a hearing before Administrative Law Judge Brian Kane (the "ALJ").  (Tr. 73-74, 85-89).  The ALJ conducted a hearing on October 18, 2013.  (Tr. 29-58).  Scarpino was represented at the hearing by her attorney Justin Goldstein, Esq.  (Tr. 29, 76).  In a decision dated December 19, 2013, the ALJ found that Scarpino was not disabled and was not entitled to benefits.  (Tr. 15-28).

On February 20, 2015, the Appeals Council denied Scarpino's request for review of the ALJ's decision.  (Tr. 1-7).  Scarpino commenced this action on April 20, 2015 seeking review of the Commissioner's decision.  (Docket # 1).

### II.      Relevant Medical Evidence[2]

#### A.      Donald Tingley, MD[3]

On November 1, 2010, Donald Tingley ("Tingley"), MD, of OcuSight Eye Center examined Scarpino and reported his findings to David Kleinman ("Kleinman"), MD, by letter. (Tr. 200-01).  Tingley reported that he had treated Scarpino for strabismus twenty years ago at St. Mary's Hospital.  (*Id.*).  Scarpino reported that her right eye had been increasingly turning inward over the past few months, she had high myopia, and currently wore contact lenses.  (*Id.*).

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

[3]  Portions of these treatment records are handwritten and difficult, if not impossible, to decipher. Accordingly, the Court has summarized only those portions that are legible.

Scarpino also reported that she had been wearing the same pair of eyeglasses for the past twenty-years, but did not have the glasses with her that day. (*Id.*). She complained of progressively worsening vision and expressed a desire to improve her eye alignment and vision. (*Id.*).

Upon examination, Tingley found that Scarpino had visual acuity, with her contact lenses, of 20/70 in the right eye and 20/60 in the left eye. (*Id.*). Tingley also found that Scarpino had no better than 20/400 vision in each eye without contact lenses. (*Id.*). Tingley further reported no nystagmus and that Scarpino's pupillary response was brisk to light without a relative afferent pupillary defect. (*Id.*). He assessed that Scarpino had significant maculopathy in both eyes related to high myopia with bilateral tractional retinal detachments or some foveal fluid perhaps related to a chronic Fuchs' spot. (*Id.*). He diagnosed Scarpino with progressive subcapsular cataracts bilateral, high myopia, bilateral myopic maculopathy, and pathologic high myopia. (*Id.*). Tingley asked Kleinman to assess whether cataract surgery could improve Scarpino's vision. (*Id.*).

On December 13, 2010, Tingley had a follow-up evaluation with Scarpino. (Tr. 199). Tingley found that Scarpino had 20/80 vision in the right eye and 20/60 vision in the left eye when she squinted with contact lenses. (*Id.*). Without squinting, Scarpino's best corrected vision was 20/200 in the right eye and 20/70 in the left eye despite myopic over-refraction of her contact lenses. (*Id.*). Tingley stated that Scarpino had visual acuity of 20/400 in the right eye and 20/100+2 in the left eye without contact lenses. (*Id.*). He opined that Scarpino's vision loss was due to a posterior subcapsular cataract bilaterally, and Scarpino expressed interest in improving her vision. (*Id.*). Tingley discussed with Scarpino the risks, benefits, and alternatives to cataract surgery, and Scarpino indicated that she wanted to proceed

with surgery.  (*Id.*).  He warned Scarpino that her vision might not improve despite surgery given her high level of myopic degeneration.  (*Id.*).  He told Scarpino that she would have to discontinue her contact lenses because she needed an accurate intraocular lens measurement, and he provided her with a prescription for glasses.  (*Id.*).

On January 11, 2011, Tingley evaluated Scarpino for painless deterioration of vision due to cataract formation.  (Tr. 198).  Tingley stated that he found evidence of clinically significant cataracts in each of Scarpino's eyes, warranting surgical intervention.  (*Id.*).  He also noted that Scarpino was scheduled for surgery on the right eye on February 10, 2011, and on the left eye on February 24, 2011.  (*Id.*).

Treatment notes suggest that Scarpino attended several additional appointments with Tingley after her surgery.  (Tr. 189-95).  During those visits, Scarpino complained of some post-surgical pain, which subsequently resolved.  (*Id.*).  She continued to wear contact lenses, but complained of difficulty reading and seeing the computer screen.  (*Id.*).  Tingley assessed her corrected vision with contact lenses to be 20/70 and 20/60.  (*Id.*).  He recommended that she use reading glasses in addition to contact lenses to assist her in reading.  (*Id.*).

On December 28, 2011, Scarpino returned for an appointment with Tingley complaining of difficulty performing daily tasks due to her vision problems.  (Tr. 209-10). Tingley reported that in February 2011 Scarpino had cataract surgery on both eyes and had 20/60 best corrected vision in both eyes after surgery.  (*Id.*).  Scarpino reported that she had difficulty seeing at a distance with her glasses and preferred to use her contact lenses.  (*Id.*).  However, she found it difficult to read with her contact lenses and did not like to use her stronger reading glasses.  (*Id.*).  She complained of feeling disoriented while wearing her glasses and not being

able to wear them during daily activities. (*Id.*). She complained of intermittent pain behind her right eye that was relieved with warm compression and Tylenol. (*Id.*).

Upon examination, Tingley assessed that Scarpino had 20/80 visual acuity in each eye with contact lenses, which was improved to 20/70 bilaterally when refraction was placed over the contact lenses. (*Id.*). Scarpino's reading visual acuity was corrected to 20/60-1. (*Id.*). Tingley reported that since her surgery Scarpino's low vision appeared to have gotten worse and the myopia in both eyes had increased slightly. (*Id.*). Tingley stated that there was no significant subcapsular fibrosis requiring laser intervention. (*Id.*). He opined that Scarpino's headaches were nonspecific and unrelated to any pathology. (*Id.*).

Tingley noted that Scarpino had been evaluated by Dr. Jagoda ("Jagoda") on December 12, 2011, who assessed that Scarpino could not see better with a +3.00, +4.00, or +5.00 magnifier at any distance. (*Id.*). Additionally, Scarpino had indicated that she did not want to use a stand magnifier for near distance. (*Id.*). Jagoda recommended refitting Scarpino's contact lenses to improve her vision or trying monovision contact lenses for distance and near. (*Id.*). Jagoda and Scarpino also discussed using reading glasses over her contact lenses or a magnifier. (*Id.*). Jagoda offered to arrange for Scarpino to receive job rehabilitation counselling through the Association for the Blind and Visually Impaired ("ABVI"), but Scarpino declined this offer. (*Id.*).

Tingley explained to Scarpino that she "d[id] not meet the criteria for legal blindness and may benefit from Social Security aid[,] however, she is able to use her vision as well as possible and there should be some improvement with magnifying glasses or stand magnifying help to be able to focus." (*Id.*).

On January 11, 2012, Scarpino communicated with Tingley regarding her difficulty obtaining approval for social security benefits based on her vision. (Tr. 211). On January 15, 2012, Tingley provided Scarpino with a letter containing information from their December 28, 2011 appointment, including the information quoted in the preceding paragraph. (Tr. 211-13). Tingley also reported that Scarpino "ha[d] difficulty with her vision resulting in low vision that d[id] interfere with her daily activities including work." (Tr. 214). Despite this, Tingley opined that Scarpino "would be able to see reasonably well with magnifying lenses for near although it is her choice not to use them at present." (*Id.*). Tingly assessed that Scarpino was somewhat depressed about her vision and was not ready to accept low vision aides to improve her near visual acuity. (*Id.*). He hoped that Scarpino's myopic degeneration stabilized without degenerative choroidal neovascularization and vision loss, which he noted was a risk with high myopia, although no signs of such degeneration had been observed. (*Id.*). He recommended that she continue to treat with Kleinman to limit further deterioration of her vision and to consider an evaluation by the ABVI. (*Id.*). Tingley asked that Scarpino be provided "any benefit for which she might be entitled." (*Id.*).

Treatment notes suggest that Scarpino had laser surgery on her right eye on August 9, 2012. (Tr. 220-22). Tingley reported that the surgery was necessary following a secondary cataract growth. (*Id.*). According to Tingley, Scarpino was scheduled to have the same surgery on her left eye. (*Id.*). Tingley reported that Kleinman was treating Scarpino for retina findings caused by extremely high myopia. (*Id.*). According to Tingley, Kleinman stated that Scarpino was quite depressed about her vision and found her challenging to work with to improve her vision. (*Id.*). According to Tingley, Scarpino had sufficient visual acuity to permit her to engage in daytime driving even without laser surgery on the left eye. (*Id.*). He stated that

6

he had offered to arrange for Scarpino to be evaluated by ABVI, but she had not taken advantage

of those services.  (*Id.*).  Tingley noted that Scarpino would like to drive and would need a

limited license for daytime driving, but had not obtained the necessary visual field test.  (*Id.*).

Tingley assessed that Scarpino suffered from low vision with depression and had limited desire

to obtain low vision help or to pursue her driving license.  (*Id.*).  Tingley opined that Scarpino's

lack of motivation might owe to her depression, and noted that Scarpino had applied for social

security disability benefits and that her vision was not disabling to the point of legal blindness.

(*Id.*).

   Scarpino had laser surgery on her left eye on October 11, 2012, and, on October

29, 2012, her corrected visual acuity was 20/50-1.  (Tr. 225).  On November 8, 2012, Scarpino

had 20/70-1 corrected vision in the right eye, and 20/50-1 corrected vision in the left eye.

(Tr. 228).  On November 13, 2012, Scarpino called Tingley's office to request the results of her

vision evaluation and to discuss the fact that she had not been cleared to drive at night.  (Tr. 227).

On November 15, 2012, Scarpino had 20/60 corrected visual acuity in each eye.  (Tr. 229).  On

December 27, 2012, Tingley completed Scarpino's eye test report for the New York State

Department of Motor Vehicles.  (Tr. 223).  On the form, Tingley indicated that Scarpino's best

corrected vision was 20/50-2 in the right eye, 20/40 in the left eye, and 20/40 in both eyes.  (*Id.*).

He indicated that the report was valid for twelve months.  (*Id.*).

   By letter dated February 25, 2014, Tingley reported that he had recently seen

Scarpino for a follow-up appointment, and Scarpino reported that she experienced intermittent

distortion of letters and words when reading.  (Tr. 267).  She also reported experiencing floaters

for the previous two months without flashing or other symptoms and occasional pain in her right

eye for the previous three years.  (*Id.*).  Tingley reported that Scarpino's visual acuity was 20/60

in each eye with her contact lenses.  (*Id.*).  Tingley explained that Scarpino's condition was

unchanged other than increased intraocular pressure consistent with ocular hypertension.  (*Id.*).

He explained that Scarpino was at risk for glaucoma, and he prescribed Timolol to be used daily.

(*Id.*).  He also stated that although he saw no acute pathology, Scarpino should see Kleinman to

determine whether any additional therapy was warranted.  (*Id.*).

On March 27, 2014, Scarpino attended an appointment with Kleinman.

(Tr. 268-70).  Kleinman reported that his examination found that Scarpino's vision was stable.

(*Id.*).  Scarpino reported chronic headaches on the right side of her head.  (*Id.*).  She had been

taking Butlab and Notriptyline without relief and reported daily pain that was sometimes severe.

(*Id.*).  Kleinman assessed that Scarpino's vision was affected by macular scarring, but without

progression.  (*Id.*).  Kleinman stated that an ocular source for Scarpino's headaches had not been

found.  (*Id.*).  He advised Scarpino to follow up with her primary care physician concerning her

depression and with Dr. Davender Khera for her headaches.  (*Id.*).

**B.**     **John Buckley, MD**

On August 8, 2011, Scarpino attended an appointment with John Buckley

("Buckley"), MD, her primary care physician, for complaints of chest and head congestion,

cough, and fatigue.  (Tr. 178-83).  Treatment notes indicated that Scarpino suffered from

depression.  (*Id.*).  She indicated that she was sleeping through the night, although she was

frequently fatigued.  (*Id.*).  Buckley observed that Scarpino looked well, her throat and lungs

were clear, her ears were normal, and her neck was without adenopathy.  (*Id.*).  Buckley's

impression was that Scarpino was suffering from acute bronchitis and that her fatigue was due to

deconditioning, and he suggested that Scarpino exercise by walking.  (*Id.*).

Scarpino returned for an appointment on December 7, 2011 complaining of increased anxiety, low mood, and fatigue. (Tr. 251-52). She reported an inability to work due to unimproved vision. (*Id.*). She reported that she had been denied disability benefits, but was reapplying. (*Id.*). She reported ongoing financial difficulties and that her relationship with her husband was strained. (*Id.*). Buckley assessed that she suffered from depression and noted that she had previously used paroxetine with success. (*Id.*). He prescribed paroxetine and alprazolam as needed for panic attacks. (*Id.*).

On April 14, 2012, Scarpino returned for an appointment with Buckley complaining of chest and head congestion. (Tr. 250). Again, Buckley assessed acute bronchitis, secondary to a bacterial infection. (*Id.*). He prescribed amoxicillin and guaifenesin with codeine. (*Id.*).

On June 3, 2012, Scarpino attended an appointment with Buckley following a motor vehicle accident on May 25, 2012. (Tr. 248-49). She had been evaluated by the emergency room and had been treated for a trapezius muscle strain with diazepam. (*Id.*). After a physical examination, Buckley noted that her left and right trapezius muscles were tender on palpation, and she had pain that worsened with head movement, abduction, and flexion of the shoulder. (*Id.*). She did not demonstrate any motor deficit. (*Id.*). He assessed a muscle strain and prescribed cyclobenzaprine and advised her to continue taking ibuprofen as needed. (*Id.*). He also advised her to remain active. (*Id.*). The treatment notes do not suggest that Scarpino was taking medication to address mental health issues. (*Id.*).

Scarpino returned for an appointment with Buckley on November 1, 2012, complaining of ongoing pain in her left shoulder, intermittent headaches, and ongoing stress. (Tr. 246-47). Scarpino reported that her shoulder pain was worse with movement and radiated to

her neck and that she experienced intermittent pain behind her right eye since her cataract

surgery. (*Id.*). According to Scarpino, her ophthalmologist had opined that the headaches were

not caused by ocular pathology. (*Id.*). Scarpino also reported ongoing stress due to her financial

situation and marital discord. (*Id.*). She reported that neither she nor her husband were working.

(*Id.*).

       Buckley assessed ongoing left shoulder pain and prescribed methocarbamol as

needed. (*Id.*). He also prescribed Fioricet as needed for headaches. (*Id.*). He assessed that her

anxiety was situational, provided counseling, but did not prescribe medication. (*Id.*).

       On January 24, 2013, Scarpino returned for another appointment with Buckley

complaining of continued right-sided headaches, which was relieved by Fioricet. (Tr. 243-45).

She also complained of depression and noted significant stress at home due to marital and

financial difficulties. (*Id.*). In addition, she complained of ongoing left arm pain. (*Id.*).

Buckley's physical exam was essentially normal, although he noted some tenderness to palpation

of the trapezius region. (*Id.*). He recommended that Scarpino try Gabapentin and continue to

take Fioricet as needed for headaches. (*Id.*). He recommended counseling and paroxetine for

depression. (*Id.*). With respect to her left arm pain, he referred her to an orthopedic for further

evaluation. (*Id.*).

       On April 11, 2013, Scarpino returned for an appointment with Buckley

complaining of head and chest congestion. (Tr. 242-43). He assessed acute bronchitis secondary

to a bacterial infection and prescribed amoxicillin and prednisone. (*Id.*). He discontinued

Gabapentin, and his notes reflect that Scarpino continued to take paroxetine for depression and

Fioricet as needed for headaches. (*Id.*).

C.     **Ralph Viola, MD**

On November 1, 2011, Scarpino was evaluated by Ralph Viola ("Viola"), MD, an ophthalmologist at Eyes on Rochester.  (Tr. 202-07).  Scarpino complained of blurry vision in her right eye since her cataract surgery earlier in the year.  (*Id.*).  She also complained of distorted vision and intermittent pain in the left eye and that it took longer to focus.  (*Id.*).  She reported that it was difficult to read or be on the computer for more than twenty minutes.  (*Id.*).  She also reported occasional pain in the right eye and reported that she had photophobia.  (*Id.*).  Scarpino denied experiencing flashes or problems with depth perception.  (*Id.*).  She reported a history of depression and anxiety.  (*Id.*).  Viola assessed that Scarpino had 20/400 uncorrected vision in both eyes, 20/70-2 corrected vision in the left eye, and 20/60-2 corrected vision in the right eye.  (*Id.*).  Viola noted that Scarpino was not on medication.  (*Id.*).  Viola reported that although there was scar tissue on both eyes, there was no evidence of holes, tears, or retinal detachments.  (*Id.*).  Viola's impression was that Scarpino had a history of high myopia and amblyopia since childhood.  (*Id.*).  He reported that thirty years earlier Scarpino had been hit in the back of her head and had developed bleeding in both eyes.  (*Id.*).  He also reported that Scarpino currently suffered from macular scarring that limited her vision.  (*Id.*).  Viola noted that Scarpino had been observed navigating the office without difficulty.  (*Id.*).

D.     **Davender Khera, MD**

On September 6, 2013, Scarpino attended an appointment with Davender Khera ("Khera"), MD, at University of Rochester Medical Center Neurology Clinic, for complaints of headaches.  (Tr. 238-40).  Scarpino reported that her headaches began shortly after her cataract surgery in 2011.  (*Id.*).  She described her pain as "stabbing" and "dull" and located in her right eye, on her right temple, and along the back of her right ear.  (*Id.*).  According to Scarpino, her

headaches occurred without any triggers and were sometimes accompanied by nausea.  (*Id.*).

Scarpino reported that she experienced daily headaches, some of which were very intense.  (*Id.*).

According to Scarpino, she had had severe headaches approximately ten to fifteen times over the

past thirty months.  (*Id.*).  She reported that she took Fioricet approximately four to five times a

week, which offered some relief.  (*Id.*).  She also took ibuprofen as needed for milder headaches,

but not on a daily basis.  (*Id.*).  She had tried Gabapentin, but had found it ineffective.  (*Id.*).  She

also reportedly took lorazepam approximately five times a month for anxiety.  (*Id.*).

   Khera noted that Scarpino was alert and interacted appropriately.  (*Id.*).  He noted

that Scarpino had a history of a dysconjugate gaze since birth and also suffered from

anxiety/depression and had previously had cataract surgery.  (*Id.*).  Upon examination, Khera

noted that Scarpino had dysconjugate eyes and an otherwise "non-focal neurological exam."

(*Id.*).  He noted no tenderness of her head or temporal arteries upon palpation.  (*Id.*).  He noted

that her gait demonstrated ataxia and imbalance and that her stance was wide with an irregular

stride.  (*Id.*).  He assessed that she might suffer from an intracranial mass or lesion that was

contributing to her headaches, and he ordered an MRI to rule this out.  (*Id.*).  He also prescribed

Depakote for headaches.  (*Id.*).

   On September 23, 2013, an MRI of Scarpino's brain demonstrated no evidence of

intracranial mass, hemorrhage, or acute infarction.  (Tr. 255).  The results did demonstrate an

increased T2/FLAIR signal within the left posterior frontal deep white matter.  (*Id.*).  The doctor

interpreting the results stated that this finding was nonspecific in appearance and might be due to

minimal ischemic change or previous trauma and/or inflammation.  (*Id.*).  Khera reviewed the

MRI and opined that it demonstrated that Scarpino's brain was "without significant abnormality

that [could] explain [her] headaches and [her] instability with walking."  (Tr. 257).

III.     **Non-Medical Evidence**

A.     **Application for Benefits**

In her application for benefits, Scarpino reported that she had been born in 1970. (Tr. 118).  According to Scarpino, she had previously been employed as a support professional, factory worker, and home health aide.  (Tr. 123).

Scarpino reported that she lived with her family and spent her days cleaning the house and caring for her children and pets.  (Tr. 138-47).  She reported that she was able to care for her personal hygiene and prepared daily meals for her family, although she needed to use a magnifying glass or have someone read the recipes to her.  (*Id.*).  She indicated that she was able to perform household chores, including cleaning, laundry, and ironing without assistance, and her husband performed the yard work.  (*Id.*).  She went outside every day by herself and was able to drive, although with some difficulty at night.  (*Id.*).  She was able to do the household shopping without assistance and could pay bills, count change, and handle a savings account. (*Id.*).

Scarpino reported that she watched television and spent time with her family on a daily basis.  (*Id.*).  She reported that she could no longer read a book without a magnifying glass. (*Id.*).  She reported that she socialized with friends and family and went to the store or to sporting events almost daily.  (*Id.*).  She reported that her eye would get sore after viewing something for a prolonged period.  (*Id.*).  She also reported occasional pain in her right eye.  (*Id.*).

Scarpino did not report any difficulty paying attention or finishing tasks, although she noted that she needed to rest her eyes after prolonged reading.  (*Id.*).  She indicated that she was able to follow written and spoken instructions and did not have difficulty getting along with

others.  (*Id.*).  She reported feeling stress if things did not go as planned, but did not have trouble with her memory.  (*Id.*).

Scarpino reported experiencing pain in her right eye several times a day, one of the causes of which was reading.  (*Id.*).  She described the pain as generally constant and dull, with occasional brief stabbing pain.  (*Id.*).  She alleviated her pain with ibuprofen or a warm compress.  (*Id.*).  According to Scarpino, she was able to perform most tasks, except reading, despite the pain.  (*Id.*).

Scarpino's mother, Diane Coccia ("Coccia"), submitted a letter in support of Scarpino's request for benefits.  (Tr. 176-77).  Coccia reported that Scarpino had suffered from vision problems since childhood and had developed pain in her eye after her cataract surgery.  (*Id.*).  According to Coccia, the pain was accompanied by a "terrible headache."  (*Id.*).  She indicated that Scarpino's pain worsened with reading and she suffered daily headaches that ranged from dull to "tremendous[ly] pain[ful]."  (*Id.*).

According to Coccia, Scarpino also suffered from depression, which was controlled with medication and support from her mother.  (*Id.*).  Coccia reported that Scarpino's depression had progressed due to her headaches and difficulty reading, but that Scarpino had not sought mental health treatment due to her reluctance to speak to a "stranger" about her life.  (*Id.*).  Coccia reported that Scarpino complained of lack of motivation and difficulty getting out of bed in the morning.  (*Id.*).  Coccia reported that Scarpino's inability to work had caused stress and financial pressures, including a pending foreclosure.  (*Id.*).  Coccia reported that although the MRI of Scarpino's brain was negative, Khera wanted to continue to try to identify the source of her headaches.  (*Id.*).  According to Coccia, Scarpino also continued to be monitored by Tingley and Kleinman.  (*Id.*).

14

B.        **Administrative Hearing Testimony**

During the administrative hearing, Scarpino testified that she was forty-three

years old and lived with her husband and their four children.  (Tr. 34).  Her youngest child was

five years old, and all of her children attended school.  (Tr. 34-35).  Scarpino's husband was

self-employed, and she did not assist him with his work.  (Tr. 35).  The only other source of

income was her son's disability benefits.  (*Id.*).

Scarpino testified that she had graduated from high school and had earned her

associates degree in human services.  (*Id.*).  She also had a direct support professional certificate.

(Tr. 36).  She testified that she had previously been employed assisting developmentally disabled

individuals with daily life skills until she had been terminated for cause in December 2009.

(Tr. 36, 38).  She subsequently received unemployment until 2012 and had searched for other

employment without success.  (Tr. 37).  Scarpino conceded that she had applied for DIB benefits

in 2011, claiming disability, while at the same time she had collected unemployment benefits,

representing that she was "ready, willing and able to return to work."  (Tr. 39).  According to

Scarpino, her disabling impairments began after her 2011 cataract surgery.  (Tr. 40).  Scarpino

testified that her doctors had attempted in vain to identify the source of her headaches.  (*Id.*).

Scarpino testified that she suffered from pain in her right eye, which she

characterized as a feeling of someone pulling her eye out of its socket.  (Tr. 41).  She also

experienced pain in the side of her head, which felt like a punch in the head.  (*Id.*).  She

experienced the pulling feeling approximately twice a week for approximately forty-five minutes

at a time; if she was able to lie down for a few minutes, the pain diminished more quickly.

(Tr. 41, 44).  According to Scarpino, she had not identified any triggers for her headaches.

(Tr. 42).  She testified that her eye pain was invariably accompanied by a headache, but she

sometimes experienced a headache without eye pain.  (*Id.*).  She testified that she dealt with her intense headaches by lying down, massaging her head, and taking Depakote, which was prescribed by her neurologist.  (Tr. 42-43).

Scarpino testified that she had scheduled an appointment with a neurologist upon the advice of legal counsel.  (Tr. 48).  According to Scarpino, she experienced headaches almost daily, but some were duller and more manageable.  (Tr. 44).  Scarpino testified that she previously took Gabapentin, which had been prescribed by her primary care physician, Buckley.  (Tr. 43).  Even with headaches, she was able to complete her household chores.  (Tr. 44-45).

Scarpino testified that she was able to read when she was not wearing her corrective lenses; she could only read while wearing corrective lenses by using reading glasses.  (Tr. 45).  According to Scarpino, prolonged reading caused eye pain, as well as textual distortion.  (*Id.*).  According to Scarpino, this distortion occurred whether reading a single page of text or working on the computer for several minutes.  (Tr. 45-46).  She was able to watch television and drive without restrictions.  (Tr. 46).  Scarpino testified that although she was lawfully permitted to drive at night, she did so only in familiar areas.  (Tr. 46-47).  According to Scarpino, Tingley cleared her to drive without limitations after her second cataract surgery, which had improved her vision to 20/40.  (Tr. 49).

Scarpino testified that she visited with her mother approximately three times a week.  (Tr. 47).  She also indicated that she suffered from depression, which caused her to be "moody" and "sad."  (*Id.*).  According to Scarpino, she felt "okay" some weeks and worse on other depending on "what's going on."  (*Id.*).

Peter Manzi ("Manzi"), a vocational expert, also testified during the hearing.  (Tr. 51-58, 168).  The ALJ asked Manzi to characterize Scarpino's previous employment.

(Tr. 106).  According to Manzi, Scarpino previously had been employed as an assembler, hand packager, home health aide, and mental retardation aide.  (Tr. 53).

The ALJ asked Manzi whether a person would be able to perform Scarpino's previous jobs, who was the same age as Scarpino, with the same education and vocational profile, and who was able to perform the full range of work at all exertional levels, but who was limited to jobs involving infrequent close visual acuity.  (Tr. 54).  Manzi testified that such an individual would be unable to perform Scarpino's previous positions.  (*Id.*).  Manzi testified that such an individual would be able to perform other jobs in the national economy, including collator operator and messenger.  (Tr. 54-55).

The ALJ then asked Manzi whether jobs would exist for the same individual with the same limitations, except that the individual could occasionally engage in activities requiring near visual acuity.  (Tr. 55).  Manzi testified that such an individual would be able to perform all of Scarpino's previous employment positions except for the assembler position, which required frequent near visual acuity.  (Tr. 55-56).

The ALJ then asked Manzi whether jobs would exist for the same individual with the same limitations, except that the individual would be unable to complete a workweek due to headaches.  (Tr. 56).  Manzi testified that such an individual would be unable to maintain competitive employment.  (*Id.*).  Scarpino's attorney asked whether an individual who was limited to occasional activities requiring near visual acuity and was off-task twenty percent of the workday would be able to perform any of the previously-identified positions.  (Tr. 56-57).  Manzi testified that such an individual would be unable to maintain competitive employment.  (Tr. 57).

## DISCUSSION

### I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether

a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v.*

*Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

> (1)   whether the claimant is currently engaged in substantial
>         gainful activity;
>
> (2)   if not, whether the claimant has any "severe impairment"
>         that "significantly limits [the claimant's] physical or mental
>         ability to do basic work activities";
>
> (3)   if so, whether any of the claimant's severe impairments
>         meets or equals one of the impairments listed in Appendix
>         1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)   if not, whether despite the claimant's severe impairments,
>         the claimant retains the residual functional capacity to
>         perform [her] past work; and
>
> (5)   if not, whether the claimant retains the residual functional
>         capacity to perform any other work that exists in significant
>         numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

###### A.     The ALJ's Decision

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 20-24).  Under step one of the process, the ALJ found that Scarpino had

not engaged in substantial gainful activity since February 10, 2011, the alleged onset date.

(Tr. 20).  At step two, the ALJ concluded that Scarpino had the severe impairments of decreased

vision and headaches.  (*Id.*).  The ALJ determined that Scarpino's depression was not severe.

(*Id.*).  At step three, the ALJ determined that Scarpino did not have an impairment (or

combination of impairments) that met or medically equaled one of the listed impairments.

(Tr. 20-21).  The ALJ concluded that Scarpino had the RFC to perform the full range of work at

all exertional levels, but was only able to engage in activities requiring near visual acuity on an

occasional basis.  (Tr. 21-23).  At step four, the ALJ determined that Scarpino was able to

perform previous employment positions, including home health aide, hand packager, and mental

retardation aide.  (Tr. 23-24).  Accordingly, the ALJ found that Scarpino was not disabled.  (*Id.*).

###### B.     Scarpino's Contentions

Scarpino contends that the ALJ's RFC determination is not supported by

substantial evidence and is the product of legal error.  (Docket ## 9-1; 13).  First, Scarpino

maintains that the ALJ's RFC determination is not supported by substantial evidence because the

record lacks a medical assessment of her functional ability to complete work-related activities.

(Docket ## 9-1 at 11-16; 13 at 1-6).  Next, Scarpino contends that the ALJ failed to consider

adequately Scarpino's complaints of pain and that his credibility analysis was otherwise flawed.

(Docket ## 9-1 at 16-22; 13 at 6-7).

## II.   **Analysis**

### A.   **RFC Assessment**

I turn first to Scarpino's contention that the ALJ's RFC assessment was flawed.

An individual's RFC is her "maximum remaining ability to do sustained work activities in an

ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999)

(quoting SSR 96–8p, 1996 WL 374184, *2 (1996)).  In making an RFC assessment, the ALJ

should consider "a claimant's physical abilities, mental abilities, symptomology, including pain

and other limitations which could interfere with work activities on a regular and continuing

basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R.

§ 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including

medical opinions and facts, physical and mental abilities, non-severe impairments, and

[p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9

(N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

Scarpino argues that the ALJ improperly formulated her RFC because he did not

rely upon any medical opinion containing a functional assessment of her work-related

capabilities.  (Docket ## 9-1 at 11-16; 13 at 1-6).  According to Scarpino, the lack of any medical

opinion created a gap in the record, requiring remand.  (*Id.*).  I disagree.

"It is well established in the Second Circuit that an ALJ is under an obligation to

develop the administrative record fully, to ensure that there are no inconsistencies in the record

that require further inquiry, and to obtain the reports of treating physicians and elicit the

appropriate testimony during the proceeding." *Martello v. Astrue*, 2013 WL 1337311, *3

(W.D.N.Y. 2013).  Given the non-adversarial nature of a Social Security hearing, "[t]he duty of

the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the

arguments both for and against the granting of benefits.'" *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) (quoting *Butts*, 388 F.3d at 386). Although the Commissioner has a general duty to develop the record, it is ultimately "the plaintiff's burden to furnish . . . medical and other evidence of disability." *Threatt v. Colvin*, 2016 WL 1103864, *4 (W.D.N.Y. 2016).

Despite a general duty to develop the record, including obtaining medical opinions of the claimant's functional capabilities, the "regulatory language provides ample flexibility for the ALJ to consider a broad array of evidence as 'medical opinions.'" *Rouse v. Colvin*, 2015 WL 7431403, *5 (W.D.N.Y. 2015) (quoting *Sickles v. Colvin*, 2014 WL 795978, *4 (N.D.N.Y. 2014)). In any event, "it is not *per se* error for an ALJ to make the RFC determination absent a medical opinion." *Lewis v. Colvin*, 2014 WL 6609637, *6 (W.D.N.Y. 2014) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29 (2d Cir. 2013)). This is particularly true where the medical evidence shows relatively minor physical impairments, such that the ALJ "permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *Id.* (quotations omitted). The salient question is whether the record "contains sufficient evidence from which an ALJ can assess the [plaintiff's RFC]." *Id.* (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x at 34).

Having carefully reviewed the administrative record, I conclude that there is no gap, that the ALJ properly formulated Scarpino's RFC based upon a comprehensive review of the record, and that his determination is supported by substantial evidence in the record. As an initial matter, I disagree with Scarpino that the record lacks a medical opinion assessing her visual abilities. Indeed, at Scarpino's request, Tingley, her treating ophthalmologist, submitted a letter in support of her request for benefits. (Tr. 212-14). In the letter, Tingley opined that although she had low vision difficulties that interfered with her daily activities and work, she

"would be able to see reasonably well with magnifying lenses for near although it is her choice not to use them at present." (Tr. 214).

Tingley's assessment is consistent with the record as a whole, which demonstrates that Scarpino suffers from diminished vision, but that her limited vision does not significantly diminish her ability to engage in everyday activities. Her medical records demonstrate that her corrected vision has varied from 20/200 to 20/40, but generally has improved after several cataract surgeries and now ranges between 20/40 to 20/60. (Tr. 190-95, 199, 209-10, 220, 223, 225, 228, 229, 267). Further, the records reflect her physicians' opinions that her vision could improve further if she availed herself of recommended low vision aids. (*Id.*). Even without those aids, her vision was adequate to permit her to engage in daily activities. Indeed, on December 27, 2012, Tingley cleared her to drive without restriction for the next twelve months. (Tr. 223).

Although Scarpino argues that the RFC is unsupported, she has failed to identify any work-related functions that she is unable to perform due to her vision that were not accounted for by the ALJ. Indeed, Scarpino has affirmed that she is able to care for her personal hygiene, prepare meals, complete household chores, including cleaning, laundry and ironing, go outside by herself, drive, perform household shopping, pay bills, care for her children, and watch television. (Tr. 46, 138-47). Indeed, the only limitations identified by Scarpino are activities requiring near visual acuity, such as reading or using the computer. (Tr. 39, 45-47, 138, 140). These limitations were identified by Tingley and are accounted for by the ALJ in his RFC determination. Thus, I conclude that the ALJ's determination is well-supported by the medical evidence, including Tingley's opinion, and is consistent with Scarpino's own testimony. Under

such circumstances, I find that the ALJ's RFC determination is supported by substantial evidence.

Even if Tingley's letter were not properly considered a medical assessment, I conclude that substantial evidence nonetheless supports the ALJ's RFC determination. Scarpino argues that the ALJ's RFC assessment is flawed because there is no medical opinion in the record assessing her ability to complete work-related functions despite her impairments relating to vision, depression, and headaches. Having carefully reviewed the record, including Scarpino's medical records, testing results, and her own statements regarding her capabilities, I conclude that the ALJ permissibly formulated Scarpino's RFC to account for the impairments supported by the record without the assistance of a medical opinion.

With respect to Scarpino's vision, as discussed at length above, the record does not demonstrate that she suffers from any functional work-related limitation that was not accounted for by the ALJ. Rather, the medical records and Scarpino's testimony demonstrate that her vision, although limited, is generally sufficient to permit her to engage in everyday activities, including driving, watching television, caring for her children, and completing household chores. Although the record demonstrates that she has some difficulty with activities requiring near visual acuity, that limitation was expressly accounted for by the ALJ in his RFC assessment.

Indeed, when evaluating whether Scarpino was able to perform her previous work, the ALJ specifically asked the vocational expert to consider positions that involved engaging only occasionally in activities requiring near visual acuity. In response, the vocational expert identified positions that would accommodate that limitation. The vocational expert was also asked whether positions existed in the national economy that would accommodate a limited

24

ability to engage in near visual acuity on an infrequent basis, and the expert responded affirmatively and identified the positions of collator operator and messenger.  (Tr. 54-55).  Even if one could quarrel with the ALJ's conclusion that the record supports a finding that Scarpino was able to engage occasionally in activities requiring near visual acuity, the record overwhelmingly supports the conclusion that Scarpino can engage in activities requiring near visual acuity on an infrequent basis.  Substantial evidence thus supports the ALJ's ultimate conclusion that Scarpino is not disabled.

Similarly, the record does not demonstrate a severe impairment resulting from depression,[4] nor does it demonstrate any functional limitations resulting from her mental health. Tellingly, Scarpino did not identify depression or any mental health related impairment in her application for benefits.  Rather, the only impairment she identified at the time of her application was her limited vision.  The medical records demonstrate that Scarpino received infrequent treatment for depression, which Buckley, the only physician who treated her depression, described as "situational."  (Tr. 246-47).  Buckley's assessment is consistent with the medical records, which demonstrate that she generally responded well to medication and discontinued medications when her symptoms resolved.  (Tr. 244-45, 246-47, 248-49, 251-52).  The assessment is also consistent with Scarpino's own description of her symptoms: that her symptoms varied, that she sometimes experienced weeks with no symptoms, and that her symptoms returned depending "on what's going on," and that she is sometimes "moody" or "sad."  (Tr. 47).  Her testimony did not identify any limitation that she suffers as a result of her depression.

---

[4] Scarpino does not challenge the ALJ's determination at step two that her depression was not severe. (Docket # 13 at 5).

The record also reflects minimal treatment or functional limitations associated with Scarpino's headaches.[5] Scarpino did not indicate in her application for benefits that she had any headache-related limitations, although she did note that following her cataract surgery in 2011 she "occasionally" suffered from a generally dull, occasionally sharp pulling sensation in her right eye. (Tr. 138, 145). Scarpino stated she was able to alleviate the pain with ibuprofen or a warm compress. (Tr. 146, 209-10, 267). She reported this concern to Tingley in December 2011 and again in February 2014, and to Kleinman in March 2014, both of whom indicated that there was no ocular pathology causing her symptoms. (Tr. 209-10, 267, 269-70).

Not until November 2012, more than one year following her 2011 cataract surgery, did Scarpino first complain to her primary care physician of headaches, despite seeing him repeatedly for other concerns following her surgery. (Tr. 246-47). Scarpino returned for one additional appointment with Buckley relating to her complaints of headaches approximately three months later. (Tr. 244-45). Scarpino did not seek any additional headache treatment until several months later in September 2013, when she was evaluated by a neurologist on the advice of her lawyer. (Tr. 48, 238-40). According to the neurologist, imaging demonstrated no intracranial mass or lesion causing her headaches, although he did prescribe medication based upon her complaints. (*Id.*).

In connection with her medical treatment, Scarpino endorsed only occasional pain or headaches, most of which were not severe in nature. (Tr. 209, 246, 267). According to Scarpino, over the course of approximately thirty months, she suffered only ten to fifteen

---

[5] I disagree to the extent that Scarpino argues that the ALJ's conclusion that her headaches did not cause any work-related limitations is necessarily inconsistent with his conclusion at step two that her headaches were severe. (Docket # 13 at 4). An ALJ's conclusions at step two are designed simply to screen out *de minimis* claims. *See McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 20014) ("an ALJ's decision is not necessarily internally inconsistent when an impairment found to be severe is ultimately found not disabling: the standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases").

"intense" headaches, or approximately one every two to three months.  (Tr. 238).  Although she

indicated during the administrative hearing that she suffered severe pain approximately twice a

week, her testimony did not suggest that this pain significantly interfered with her ability to

engage in everyday activities.  (Tr. 42, 44).  Scarpino testified that although she would

sometimes lie down to alleviate her pain, she was generally capable of performing her household

duties, "just so [the chores] get[] done."  (Tr. 44-45).

   In sum, the record contained Scarpino's medical treatment notes and testing

results, and there are no apparent gaps in those records.  A comprehensive review of that record

demonstrates that Scarpino suffered from a relatively narrow medical impairment and

correspondingly narrow functional impairment limited to her ability to engage in activities

requiring near visual acuity, such as reading or using a computer.  With respect to that limitation,

the record further suggests that Scarpino's abilities would improve if she availed herself of

available low vision aides, which she chose not to do.  In any event, her near visual acuity

limitation was expressly accounted for by the ALJ in his RFC assessment.  The medical evidence

and Scarpino's own testimony concerning her activities of daily living do not suggest any

additional limitations.  Under such circumstances, I conclude that the ALJ was permitted to

formulate an RFC without a medical opinion that directly assessed Scarpino's ability to complete

work-related functions.  *See Countryman v. Colvin*, 2016 WL 4082730, *13 (W.D.N.Y. 2016)

(ALJ was permitted to make common sense judgment regarding plaintiff's reaching limitation

despite absence of medical opinion assessing that limitation where record showed relatively

minor impairment and where "lack of . . . evidence in the record support[ed] a more restrictive

limitation"); *Lay v. Colvin*, 2016 WL 3355436, *7 (W.D.N.Y. 2016) (ALJ was permitted to

consider medical records and use common sense judgment to arrive "at a reasonable conclusion

regarding [p]laintiff's RFC, as permitted by the [r]egulations"); *Crook v. Colvin*, 2016 WL 593567, *7 (D. Or. 2016) (ALJ did not err in failing to order vision evaluation where treatment notes reflected that plaintiff's visual acuity was 20/50 and that she had difficulty seeing fine print and conducting tasks requiring stereo vision and where the ALJ accounted for those limitations in his RFC); *Rouse v. Colvin*, 2015 WL 7431403 at *6 (no *per se* error where record did not contain "recent medical opinion that specifies [p]laintiff's specific functional abilities, or evidence an RFC report was requested" where "RFC determination was based on substantial evidence because the record contained ample evidence for the ALJ to make a finding on disability"); *Lewis v. Colvin*, 2014 WL 6609637 at *6 ("[i]n light of the record evidence, the relatively minor physical impairments at issue, and the absence of physician/patient relationships, this [c]ourt concludes it was permissible for the ALJ to make an RFC determination without a treating source's opinion"); *Schade v. Colvin*, 2014 WL 4204946, *23 (E.D. Mo. 2014) (ALJ did not err by failing to order consultative examination to assess plaintiff's mental capabilities where plaintiff did not include allegations of depression or anxiety in her application and did not testify to any mental impairments that limited her ability to work); *Gillard v. Colvin*, 2013 WL 954909, *3 (N.D.N.Y. 2013) (ALJ did not err in failing to order consultative psychological exam where plaintiff sought sporadic treatment for mental health issues and did not identify any limitations caused by depression in application or hearing testimony); *Brown v. Astrue*, 2013 WL 310292, *3 (N.D.N.Y. 2013) (ALJ permissibly rendered common sense judgment regarding plaintiff's ability to lift and carry despite absence of medical source statement opining as to weight plaintiff could manage where record demonstrated relatively minor physical impairment and ALJ's determination was supported by medical evidence of record); *Bianco v. Astrue*, 2012 WL 441147, *11 (E.D. Mo. 2012) (ALJ did not err

by failing to obtain medical opinion assessing plaintiff's functional capacity; "[w]ith respect to plaintiff's obesity and alleged depression, plaintiff and his physicians have not identified additional functional limitations attributable to either condition[, and] [u]nder these circumstances, the ALJ was not required to obtain additional consultative examinations"); *Taylor v. Astrue*, 2012 WL 294532, *7 (D. Md. 2012) (ALJ adequately accounted for plaintiff's visual limitations caused by cataracts where visual acuity tests demonstrated corrected vision between 20/50 and 20/70 and ALJ "incorporated a specific visual acuity limitation reflecting these results into his RFC").

     **B.**    **Credibility Assessment**

     I turn next to Scarpino's contention that the ALJ's credibility analysis is flawed because he failed to consider Scarpino's complaints of pain and mischaracterized the record. (Docket ## 9-1 at 16-22; 13 at 6-7).

     An ALJ's credibility assessment should reflect a two-step analysis.  *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011).  First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom.  *Id.* (citing 20 C.F.R. § 404.1529).  Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record."  *Id.* (citing 20 C.F.R. § 404.1529(c)). The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and

> (7) other factors concerning the claimant's functional limitations
> and restrictions due to pain or other symptoms.

*Id.* (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)).

The ALJ concluded that Scarpino's statements "concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible for the reasons explained in this decision." (Tr. 22). In reaching that conclusion, the ALJ assessed Scarpino's subjective complaints in the context of a comprehensive review of the entire record. I disagree with Scarpino's contention that the ALJ mischaracterized the evidence.

Scarpino maintains that the ALJ mischaracterized the record by indicating that Scarpino's headaches did not prevent her from completing her activities of daily living. (Docket ## 9-1 at 18-20; 13 at 6). Although she testified that she would lie down "for a couple of minutes" if her schedule permitted in order to relieve her headaches or postpone completing household chores, she also testified that she could complete her chores while experiencing a headache. (Tr. 44-45). Indeed, in connection with her application, Scarpino reported that despite her pain, she was able to engage in normal activities, except for reading. (Tr. 147). Thus, I reject Scarpino's suggestion that the record demonstrates that she was "incapacitated" while suffering from a headache. (Docket # 13 at 6). Indeed, the record demonstrates the opposite.

Although Scarpino testified at the hearing that she suffered significant and frequent pain, the record demonstrates that Scarpino previously characterized her headaches as generally dull and capable of being alleviated with ibuprofen and a warm compress. Indeed, Scarpino reported to Khera that she experienced severe headaches only once every two to three months. Moreover, nothing in the record or in her testimony suggests that her headaches significantly interfered with her ability to manage her household, care for her children, or care

for herself.  Accordingly, I conclude that the ALJ accurately described Scarpino's ability to complete her daily activities.

Further, I disagree with Scarpino's suggestion that the ALJ somehow erred because he failed to note that she complained of headaches to Tingley and received treatment from Buckley.  (Docket # 9-1 at 19).  "[A]n ALJ is not required to discuss every piece of evidence submitted[,] . . . [and] [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  Accordingly, the mere fact that the ALJ did not reference her complaints to Tingley or the treatment she received from Buckley does not necessarily indicate that the ALJ did not consider those treatment records.  Indeed, at the hearing, the ALJ questioned Scarpino about her complaints to Buckley of headaches.  (Tr. 49).  I similarly conclude that the ALJ's failure to explicitly consider the statement submitted by Coccia (Docket # 9-1- at 21-22), which was largely cumulative of Scarpino's testimony, does not warrant remand.  *See Burns v. Colvin*, 2016 WL 270311, *7 (W.D.N.C. 2016).

I do agree with Scarpino that the ALJ mistakenly indicated that she had not received any mental health treatment.  In fact, the record demonstrates that Scarpino received sporadic treatment from Buckley for her depression and anxiety, which he assessed to be "situational," and treated with medication as needed.  (Tr. 244-49).

I find, however, that the ALJ's misstatement about Scarpino's mental health treatment was not material to his credibility analysis and does not justify remand.  The ALJ assessed Scarpino's subjective complaints in the context of a comprehensive review of the entire medical record.  He accounted for the relevant factors identified above and concluded that Scarpino described daily activities that were inconsistent with her complaints of disabling

31

symptoms and limitations.  The remaining evidence in the record identified by the ALJ was

sufficient to support his adverse credibility determination.  Thus, I conclude that the ALJ's

misstatement was harmless and that his credibility assessment is supported by substantial

evidence.  *See Andrews v. Colvin*, 2013 WL 5878114, *12 (W.D.N.Y. 2013) ("because there is

substantial evidence supporting the remainder of the credibility analysis, the ALJ's misstatement

. . . is harmless and does not affect the outcome of the case") (citing *Barringer v. Comm'r of Soc.*

*Sec.*, 358 F. Supp. 2d 67, 83 n.26 (N.D.N.Y. 2005) (noting that an ALJ's incorrect rendition of

facts in the record is nothing more than harmless error where his credibility assessment is amply

supported by other substantial evidence)).  In sum, I conclude that the ALJ applied the proper

legal standards in analyzing Scarpino's subjective complaints and that substantial evidence

supports the ALJ's determination that Scarpino's complaints were not entirely credible.  *See*

*Luther v. Colvin*, 2013 WL 3816540, *7 (W.D.N.Y. 2013) (ALJ properly assessed subjective

complaints where she "reviewed all of [p]laintiff's subjective complaints . . . [and] properly

considered [p]laintiff's activities of daily living, inconsistent testimony and how her symptoms

affected her attempts at maintaining a job").

## CONCLUSION

After careful review of the entire record, this Court finds that the Commissioner's

denial of DIB was based on substantial evidence and was not erroneous as a matter of law.

Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's

motion for judgment on the pleadings (**Docket # 11**) is **GRANTED**.  Scarpino's motion for

judgment on the pleadings (**Docket # 9**) is **DENIED**, and Scarpino's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


                                      *s/Marian W. Payson*

                                      MARIAN W. PAYSON
                              United States Magistrate Judge

Dated: Rochester, New York
       September 26, 2016